Hendricks v. John or Jane Doe's 1115 Okay, whenever you're ready and if the microphones are in a good spot there. Okay. Good morning. May it please the court. Cassandra Liu for Plaintiff Appellant Troy Hendricks. Mr. Hendricks spent 16 years in solitary confinement, the vast majority of his days spent in a cell the size of a parking space. In analyzing Mr. Hendricks' 14th and 8th Amendment claims against the defendants that kept him there year after year, the district court did not apply this court's binding precedents and there are genuine disputes of material fact on both of those claims such that this court should reverse. I'll start with the violation of Mr. Hendricks' rights under the 14th Amendment. This case here is almost identical to Proctor, where defendants repeatedly relied on years-old past crimes and an escaped attempt to justify keeping the plaintiff in ad sag. And Mr. Hendricks' evidence here presents the same types of red flags that this court said in Proctor would allow a reasonable jury to find that his periodic reviews Was that established before Proctor or was it established by Proctor? Because it seems to me that Proctor is a very important opinion and it may be that the standard changed before and after Proctor because of Proctor. Your Honor, Proctor was not the first case to establish the right to meaningful reviews, but Proctor did lay out factors for courts to decide whether or not a meaningful process was allowed, given in a particular case. But here there are three things that I want to point out that are very similar to Proctor. First, defendants admitted here that they solely relied on years-old past crimes to keep Mr. Hendricks in ad sag. For example, Defendant O'Gorman testified that a lot... Is that a fair characterization that they said that they didn't rely on the original underlying incident, but the idea that they solely relied on that? In fact, didn't they say they considered the subsequent behavior while he was in ad sag? Your Honor, you'll allow me to read the quote. Mr. O'Gorman testified that a lot of it comes down to the fact that this individual tried to escape from court. And Mr. Belnier also admitted that the reason he's in there has not changed. So the appropriate place for him to be is his current confinement. That's testimony from both of these defendants. It's similar to the types of statements that Proctor found raises serious doubts about whether or not the outcome of the reviews was preordained or not. Second, defendants used pretextual reasons to justify keeping Mr. Hendricks in ad sag, despite the fact that he had no disciplinary instance for stretches of six or seven years at a time. And I'll just give one example. His letter-writing campaigns to express grievances about his very conditions of confinement, that was characterized as manipulativeness. Third, the reviews were a copy-and-paste job for years. And plaintiff's expert Stephen St. Clair, as well as in Plaintiff's Brief, points out to sentences not just in the historical portions of the reviews, but sentences that were used to justify keeping Mr. Hendricks in ad sag. The same sentences were written 20 times, 40 times over the course of his confinement. The reviews were very similar for years. And all of this evidence on summary judgment puts into question whether or not Mr. Hendricks received the procedural sufficiency for his reviews. And that is all that is required under Proctor for Mr. Hendricks to prevail on summary judgment. I'd like to move on to the Eighth Amendment claim, in which reversal is required because there are genuine disputes of material fact as to the conditions of confinement that Mr. Hendricks was subjected to, as well as to defendant's subjective intent. On the objective prong, two points that the district court ignored. First was the district court completely ignored the length of confinement, 16 years, and that's at odds with the Supreme Court's decision in Huddle and this Court's decision in Gonzales that the length of confinement cannot be ignored. Second, the district court ignored both Mr. Hendricks' own testimony about the conditions that he faced being in a cell for 22 to 23 hours a day, completely lacking opportunities to meaningfully communicate with anyone, as well as the expert opinion from the psychiatric expert Dr. Stuart Grassley about how those conditions deprived Mr. Hendricks of the basic human needs for social and mental stimulation. And the testimony from Mr. Hendricks and the expert opinion from Dr. Grassley, at the very least, creates factual disputes that are similar to the factual disputes that this Court said in Reynolds would require a reversal of the grant of summary judgment, and this Court should reverse here as well. To touch on the subjective prong of the Eighth Amendment claim, there's evidence from which a reasonable jury could find that defendants actually knew about the risk of harm or that the risk of harm was so obvious that defendants should have known about it. And under Farmer, these are questions of facts that were demonstrated. And what is the evidence here that the defendants had subjectively an awareness or showed deliberate indifference to a serious risk to Mr. Hendricks' well-being? Sure. Mr. Hendricks wrote grievances and letters, numerous grievances and letters, to both of these defendants, to all three of these defendants, discussing his lack of meaningful reviews, discussing his conditions. Right, but did those letters go to specifically something that would make them aware that this is having an impact on his health or there's a risk of impact on his health or his mental well-being? Because the fact that he's submitting grievances about sort of the process of review is not something I think that would give these defendants awareness of the fact that this is a serious risk to his health. Sure. Mr. Hendricks did touch on his mental health state in some of these grievances. But as to the risk of harm being obvious, that is also a prong under Farmer that can be used to at least on summary judgment prove whether or not defendants had the requisite knowledge. And defendants, as career DOCS officials, a reasonable jury could find that they were aware of the risk of harm of prolonged solitary confinement. And there is evidence that Mr. Hendricks presented, including Supreme Court decisions from over a century ago that talk about how well-being. But doesn't it have to be specific to him? I mean, first of all, just on the general idea of these prison officials being aware generally of the harm of prolonged solitary confinement. I mean, I don't know whether or not that is true. But even accepting that, the standard that has to be met for this objective prong is that they were aware that in this particular incidence, this individual was subject to a risk. It can't be, I don't think, just that in general we know that prolonged solitary is a risk. So any time someone's been in for 10, 15, however many years, that can't be enough to satisfy the subjective prong, I don't think. Well, the defendants, if they're aware of how long Mr. Hendricks was actually in Ag Sec, and it was on every single review that they signed off on, the date in which he was first placed into Ag Sec, so they knew for a fact how long he had been in Ag Sec in combination with the general well-known risk of harm of solitary confinement, a reasonable jury at summary judgment, all we have to know is that a reasonable jury could find that defendants knew specifically as to Mr. Hendricks. But is that, so are you suggesting effectively a per se rule, that any time an individual is in solitary for a prolonged period and the officials know how long they've been in solitary, that that's enough? Well, they should know, and on summary judgment I think that is enough. Okay. All right. Thank you, Ms. Lee. You have some time for rebuttal. May it please the Court, starting with the procedural due process claim, the… You could raise the lectern. I think it's all the way up. This will work. There's no dispute that the periodic reviews of Mr. Hendricks' administrative segregation took account of all developments, both past and present, good and bad, meticulously documented them and included them. I think there actually is a dispute about that, isn't there? You're saying there's no dispute that the reviews took account of all elements. I think that's exactly what is being disputed, that the reviews, in fact, weren't meaningful and didn't take account of all elements. There's no dispute that the reviews documented all of the developments and that those developments were discussed in the analysis. The defendants also provided undisputed testimony that they considered all of those developments. So all we have are reviews that accurately describe all of the developments, that incorporate those developments in the analysis, and that rely not only on the underlying crimes, and this is an important fact I want to emphasize, but also on an extremely important ongoing factor, which was Mr. Hendricks' adamant refusal to take responsibility for any of his crimes, including his underlying escape attempt. And docs reasonably concluded that that failure significantly increased the likelihood that he would again engage in the same kind of violent conduct, because after his escape attempt, he had told the sentencing judge, the only regret I have is that I didn't get the gun out of the court officer's holster. He was convicted of attempting to wrest the gun from the court officer's holster. And one shudders to think what he would have done if he had gotten it. And he never recanted that position. He never expressed regret for that action. And docs was well within its rights to conclude that a person who expresses no remorse and acknowledges no wrongdoing over the course of many years has not demonstrated the level of reformation that would allow them to safely return to the general population, especially given the exceptionally vicious crimes that he committed that were premeditated. And as one of the defendants pointed out in his testimony, this pattern of behavior is not learned overnight. One does not – But the underlying offense will never change, correct? Correct. And so there is – that can never be erased, that can never be minimized. That is always there. And didn't we acknowledge in Proctor that, yes, that can be considered and, yes, it's extremely important, but if that's the overriding factor, then you're not getting a meaningful review because that aspect is not going to change. Well, the court in Proctor acknowledged that the defendants can weigh past events more heavily, especially, again, where there's an ongoing factor, which is the failure to acknowledge wrongdoing. So it's not just that someone committed a crime 10 years ago. It's that they refused to acknowledge that what they did was wrong or to engage in rehabilitative therapy that Dox considered to be crucial to his reformation. That's kind of a dangerous theory, it seems to me, because supposing he doesn't think he did anything wrong. That's the end of the rubber stamp? He doesn't – until he thinks in his head that he was wrong, he's got to stay in administrative segregation. Well, Dox is entitled to rely on his conviction. He was found guilty beyond a reasonable doubt of committing these acts. And in determining whether he posed a security risk, Dox was not required to relitigate his underlying crimes. And the information that he provided in response to these periodic reviews— That's true, Michael. Until he changes that view, because he has to in order to get out of administrative segregation, until he changes his view, he can just rubber stamp them and keep them in there forever. They didn't just rubber stamp it. That was one fact. Yeah, you can. Why not? Because there has to be a meaningful review. So obviously if it's just a rubber stamp and they're saying he hasn't changed his view, so we're going to continue, that would be a problem. But here the testimony from the defendants was that they considered all information, good and bad. I mean, perhaps if he had showed a sufficiently positive attitude overall, that would have sufficed even absent an express acknowledgment of wrongdoing. They never foreclosed that. But the bottom line is that he continued to engage in disciplinary violations. He continued to engage in manipulative behavior. And just on the point of the letter-writing campaign, what Dox found troubling was that Mr. Hendricks convinced an entire housing unit of incarcerated individuals to submit complaints about an issue that did not affect them personally. And they thought that was troubling because it showed his influence over other incarcerated individuals and his ability to organize them for nefarious purposes, even in the context of administrative segregation. It wasn't simply that he was encouraging them to complain about things and express legitimate complaints. They were signing on to something that didn't concern them at all. So in the context of his tendency to coordinate with other people and his reputation for having influence in the prison setting, combined with his penchant for extreme violence, that was a... Is that really... I mean, these incidents involving the other incidents. I mean, certainly those are, from an administrative point of view for the prisons, problematic, not something they like. But if the reason for being in administrative segregation is ultimately security to tie in, well, you know, he's a problematic type of person or he's a troublemaker and those types of things. That's enough to sort of balance against, as I know you're going to reference, the fact of this incident that got him in there in the first place? That is still engaging in a meaningful review? Yes, because those incidents were closely related to the underlying tendencies they were concerned about. Because his underlying... But they weren't violent offenses. How are they related to what you're calling underlying tendencies? Well, the tendency they were concerned about was coordinating with other offenders to commit either violent acts or other disruptive acts. So there's a security... But these weren't violent acts, the ones that you're referencing. No, but they suggest that if he had an opportunity, he might coordinate with others for violent acts. Why do they suggest that? I don't understand the connection to the fact that someone is saying, hey, let's all write... Someone is saying, let's write all these letters and complain about this, and they do it. How does that suggest a penchant for violence? It doesn't go to violence, but it goes to coordination for nefarious purposes, coordination for disruptive purposes. So it shows that he has influence. It shows that he's still willing to coordinate with others to engage in disruptive behavior. And he doesn't have the opportunity for violent action in administrative segregation. But if he were placed in the general population, and he had access to a correction officer with a firearm, and he premeditated with others, it could lead to lethal results. And so you're right, it doesn't speak to violence specifically, but it does speak to the coordination with other offenders for, not for legitimate purposes, but simply to cause disruption. Turning to the Eighth Amendment claim, there are really two parts to their claim. One part focuses on the general conditions of confinement and administrative segregation and the length of confinement. And that claim is most readily resolved on qualified immunity grounds for the simple reason that there is no precedent from this Court or the Supreme Court clearly establishing that long-term segregated confinement violates the Eighth Amendment. To the contrary, segregated confinement was widespread throughout the country through this entire period. And only in the last few years have states, New York first among them, started to pass laws restricting segregated confinement based on a growing awareness that prolonged isolation can have adverse health effects. But that policy change merely underscores that during this period in question, a reasonable official would not have thought this type of confinement violates the Eighth Amendment. And what about Procter, though? I mean, this Procter was decided 2017, so it's in, I guess, the midst or part of the time period at issue here. Can we say that after 2017 a reasonable officer would have been aware of that or a reasonable official, particularly given I think some of the same officials are at play? Well, Procter only addressed the due process issue. So we acknowledge that Procter did affect a significant change of the law as of 2017. And I think at a minimum the court should find on due process that before that, as Judge Sack indicated, the law was not clearly established because all the Supreme Court had said is that there needs to be some sort of review. But the criteria for that review were not at all spelled out until Procter. But— That doesn't affect the Eighth Amendment at all? Doesn't affect the Eighth Amendment at all because Procter didn't address an Eighth Amendment claim. And in fact, this court in Reynolds v. Kuros in 2021, which is after the relevant period, addressed an Eighth Amendment claim based on segregated confinement. And the court said that if the conditions of confinement did constitute solitary confinement, which we don't think is the case here, as I'll explain in a minute, Reynolds could arguably prevail on an Eighth Amendment claim, arguably prevail. And that's in 2021. That does not clearly establish that long-term— and by the way, in that case, a Connecticut statute required that individual to remain in segregated confinement for the rest of his life because he was formally on death row, and then the legislature passed a law that placed him in basically segregated confinement for life. And the court said that that was arguably a violation of the Eighth Amendment if the conditions of confinement were solitary confinement, which the evidence here does not show. And I'll just point—we go through all of the conditions in detail. It wasn't solitary because there were, as I recall, rats and spiders. Is that what you're talking about? I mean, it was pretty horrific, I thought. The evidence—so your Honor is referring to conditions that he claims he experienced at one facility. And, you know, we point out the evidence about that in the brief. It doesn't support their description of what happened. He mentions in passing that there was an infestation at some point, but as Judge Lee pointed out, there is no evidence that the individual defendants had knowledge of those conditions. And as to the grievances and letters that he filed, none of them discussed particular conditions of confinement. The one letter where he talks about his mental health was actually addressed to a different official, and that's—if you look at page 834 of the record, it was addressed to someone named Don Venitose, who was a director of special housing unit. All the other letters addressed his periodic reviews. As soon as you finish, I'm going to ask the presiding—permission to ask you a basically irrelevant question. By all means. You just mentioned the fact that he was not in a particular institution. He was moved around from institution to institution, which is something somebody who doesn't have the kind of criminal law background would have thought he was sent to jail and he stays in jail until he gets out. That's not the case. And I was wondering whether—how things changed as he changed from one institution to— how many institutions, four or five? During the relevant period, I would say four or five institutions, yes. And what changes, if anything, did he say changed? Well, so he said his conditions were the worst at the Elmira facility, where he was for five years. But one thing I'll emphasize is that during the vast majority of his time in administrative segregation, he was in group therapy programs where he received two to four hours of daily out-of-cell group programming, where he could interact with other incarcerated individuals and mental health professionals. That is a far cry from what one normally thinks of as solitary confinement. That's a very significant amount of mental health treatment. And I'll note that there are cases, recent cases, from other circuits addressing Eighth Amendment claims based on segregated confinement, and those cases focus on the lack of mental health treatment. And here, Mr. Hendricks received ample treatment throughout his period of administrative segregation, and the records show that his mental health was stable and even improved during his period of administrative segregation. And there's no evidence—to return to Judge Lee's point— there's no evidence that the defendants here were aware of any deterioration in his mental health. On the contrary, they testified that he was exceptionally physically fit and that he was mentally stable, and that's exactly what the mental health records show as well, that he actually was in remission from his bipolar disorder, which he had entering the facility. And the records also show that he— Sounds like he should get out of administrative segregation. He ultimately did. He was ultimately placed in a step-down program, and he received— he participated positively in the programming that was required, and he was ultimately released from administrative segregation. And I'll end with one last point, which is that this type of confinement no longer exists in New York because the legislature has passed a law that seriously restricts segregated confinement, and other states, like Connecticut, has passed a similar law. So this is not an issue that's likely to recur, but the main point is that during this relevant period, it was a widespread practice, and there was no— Perhaps they're still using it in Vermont, is that what you mean? Well, there are restrictions in— I'm sorry. That was just—you seemed to be ticking off the second circuit. Well, I have to say I was researching that this morning. Vermont also seems to have some restrictions on segregated confinement. Okay. So I think it's unlikely to recur in this circuit, but certainly during the relevant period, it was a widespread practice, and a reasonable official would not have thought that it was problematic, much less that it was cruel and unusual. All right. Thank you. Thank you. I just want to make a couple quick points here. First, a lot of defendants' argument is based on believing their testimony on the factors that they considered, the reasons why they kept Mr. Hendricks in ADSEG, and I want to point out that is not what we're asking the courts to do here, to weigh or re-weigh the defendant's decision. It is about the process, whether or not there was meaningful process, and for all the reasons that I talked about, all those red flags in Procter, I would say that there's sufficient disputes of material fact that there was not a meaningful process, and I just want to—my friend on the other side talked a lot about the fact that defendants relied on the lack of remorse, and I want to point out that in Procter, said almost the exact same thing, that even if Procter would continue behaving well, he would consider keeping Procter in ADSEG because he had not accepted responsibility for his past actions, and the court said that is not okay, that does not show that there was meaningful consideration. So here, Procter, I think, controls on the 14th Amendment claim. On the 8th Amendment claim, on the subjective prong, Your Honor asked about evidence, whether or not they were aware of Mr. Hendricks' mental state, and I'd like to cite to the record at A2079, this is a letter that was addressed to Balmier and Cappius, that specifically describes Mr. Hendricks' deteriorating mental state, and my friend also mentioned mental health records, which also document Mr. Hendricks' mental state. I also want to point out that the harm itself is not a factor in the 8th Amendment analysis, is whether or not defendants were aware of the risk of harm. Briefly on qualified immunity, we talked about how Procter was not the first decision in this court to establish the right to meaningful reviews, and I want to point out, in 2001, this court in McClary, relying on Hewitt, denied qualified immunity to defendants who were not conducting periodic reviews that were not a sham, and on the 8th Amendment claim, the Supreme Court, as early as 1978 in Huddle v. Finley, already stated that confinement in an isolation cell is subject to 8th Amendment scrutiny, and this court in Collins v. Sims, both in 2000, recognized that 305 days of solitary confinement constitutes an atypical and significant hardship, and here, Mr. Hendricks was confined for 16 years. I hope that addresses the court. Do you have any questions? All right. Thank you. Thank you to you both. We will take the case under advisement.